UNITED STATES, Appellee,

v.

Melvin B. LAGASSE, Jr., Defendant, Appellant.

No. 95–2109.

United States Court of Appeals, First Circuit.

Heard April 3, 1996.

Decided June 25, 1996.

---

**20**

Walter F. McKee, Augusta, ME, with whom Lipman & Katz, P.A. was on brief for appellant.

F. Mark Terison, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, and George T. Dilworth, Assistant United States Attorney, were on brief for appellee.

Before SELYA, Circuit Judge, ALDRICH, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

Defendant-appellant Melvin B. Lagasse, Jr., pleaded guilty to a drug trafficking conspiracy and was sentenced to 264 months' incarceration. Lagasse now appeals three aspects of his sentence: (1) an enhancement for possession of a dangerous weapon; (2) an enhancement for obstruction of justice; and (3) the denial of an adjustment for acceptance of responsibility. We affirm in part, vacate in part and remand.

## I.

### Factual Background and Prior Proceedings

We accept the facts found in the uncontested portions of the Presentence Investigation Report ("PSR") and the sentencing hearing transcript. *See United States v. Lindia,* 82 F.3d 1154, 1158 (1st Cir.1996). Additional facts pertinent to the issues in this appeal are discussed below.

### A. Offense Conduct

In the summer of 1994, the Maine Drug Enforcement Agency ("MDEA") began investigating a crack cocaine ring in the Lewiston/Auburn area. The investigation revealed that the drug suppliers, Raul Baez, Jesus Baez and Angel Baez, operated out of Lawrence, Massachusetts, and that Jose Guzman, Toni Lemieux Naftali ("Naftali") and Jose Mejia–Martinez transported the drugs to Maine for ultimate distribution. Appellant Melvin Lagasse ("Lagasse"), his brother, Michael Lagasse, and three others, Marlane Driggers, Lisa Booth and Thomas Booth, would also on occasion transport the crack cocaine ("crack") to Maine and sell it in Lewiston and Auburn.

From July through early September 1994, Lagasse purchased about 100 bags of crack per week from various persons including Naftali, Jesus Baez, Guzman, Driggers and Mejia–Martinez. Lagasse procured the drug both for distribution and for personal use. He continued to use and sell crack until December 7, 1994, when he was arrested while in possession of almost 100 grams of crack.

On December 20, 1994, a grand jury returned an indictment charging in Count I that Lagasse conspired with the Baezes, Driggers, Michael Lagasse, the Booths and others to distribute and to possess with intent to distribute in excess of fifty grams of cocaine base (*i.e.,* crack). Lagasse pleaded guilty to that count in February 1995; other counts against him were dismissed.

### B. Sentencing

The district court held a sentencing hearing on September 14, 1995, during which it

took evidence and heard the testimony of nine witnesses, including Lagasse. At the conclusion of the hearing, the court made the following findings and rulings which are at issue in this appeal: (1) that an upward adjustment for possession of a dangerous weapon was applicable because Lagasse was involved in a knife-point robbery of drugs and money from Naftali and Guzman; (2) that an upward adjustment for obstruction of justice was appropriate because Lagasse assaulted a witness in retaliation for, and to prevent his further cooperation with authorities; and (3) that a downward adjustment for acceptance of responsibility was not warranted both because Lagasse obstructed justice and because he attempted to have drugs smuggled to him in prison where he was awaiting sentencing.

## II.

### Discussion

#### A. Standard of Review

■ We review a sentencing court's factual determinations, which must be found by a preponderance of the evidence, for clear error. *United States v. McCarthy*, 77 F.3d 522, 535 (1st Cir.1996). We review questions of law, including the applicability of a sentencing guideline, de novo. *Id.*

#### B. Enhancement for Possession of a Dangerous Weapon

■ Lagasse challenges the district court's application of a dangerous weapon enhancement to his sentence. The pertinent sentencing guideline, U.S.S.G. § 2D1.1(b)(1), provides for a two-level increase in the base offense level "[i]f a dangerous weapon (including a firearm) was possessed."[1] Application note 3 to that guideline provides, in part:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons.

The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.

U.S.S.G. § 2D1.1, comment. (n.3).

At the sentencing hearing, Naftali, a co-conspirator, testified that, throughout the day of September 8, 1994 (a point within the indictment period of the charged conspiracy), Lagasse repeatedly requested and received crack from her. Naftali stated that she eventually rebuffed his requests for more of the drug because he continued to use rather than sell it. Later, in the early morning hours of September 9, Lagasse returned to Naftali's apartment and requested more crack from her and her roommate, Guzman. Both refused, and Lagasse left. Seconds later, however, Lagasse forcibly reentered the apartment with one Michael Weaver who walked into Guzman's room and held a knife to Guzman's neck; Lagasse stood close behind Weaver during this encounter. Lagasse and Weaver then took all of the drugs and cash in the apartment and left.[2]

Based on this event, the court found the weapon enhancement appropriate, explaining:

> I observe first of all that the circumstances here are rather unique in the application of this adjustment because here the possession of the weapon was not in furtherance of the drug conspiracy in the sense that Weaver with Lagasse's connivance was trying to steal from the conspiracy.
>
> Nevertheless, [Application note 3] points out that the reason for the adjustment is the increased danger of violence when drug traffickers possess weapons. I certainly attribute Weaver's possession of the weapon to this defendant because they were there jointly.[3] And I conclude although it is an unusual case that the circumstances here fit the definition of Appli-

---

1. Unless otherwise indicated, all guideline citations are to the November 1994 United States Sentencing Commission's Guidelines Manual.

2. Later that same day, police arrested Naftali and Guzman after discovering large quantities of crack in their automobile.

3. On appeal, Lagasse does not contest the court's attribution of the knife possession to him.

cation Note 3 and call for the two level increase.

■ We begin our analysis with a brief review of the basic principles underlying the application of the dangerous weapon enhancement. For the enhancement to be warranted, a certain nexus between the weapon and the offense must be shown. *See United States v. Pineda*, 981 F.2d 569, 573 (1st Cir.1992). It need not be shown, however, that the weapon was used, or was intended to be used, to perpetrate the drug offense. *United States v. Castillo*, 979 F.2d 8, 10 (1st Cir.1992); *see also, United States v. Ruiz*, 905 F.2d 499, 507 (1st Cir.1990). Rather, for the purposes of the enhancement, we have repeatedly recognized that

"when the weapon's location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapons to the offense conduct."

*United States v. Ovalle–Marquez*, 36 F.3d 212, 224 (1st Cir.1994) (quoting *United States v. Corcimiglia*, 967 F.2d 724, 727 (1st Cir. 1992)), *cert. denied*, —— U.S. ——, 115 S.Ct. 947, 130 L.Ed.2d 891, —— U.S. ——, 115 S.Ct. 1322, 131 L.Ed.2d 202 (1995). In other words, the presence of a dangerous weapon at some point during the underlying drug crime may indicate the probability of a "facilitative nexus between the [weapon] and the crime." *United States v. Gonzalez–Vazquez*, 34 F.3d 19, 25 (1st Cir.1994).

■ Once the presence of a weapon is established, the defendant may avoid the enhancement only by demonstrating "special circumstances" rendering it "clearly improbable" that the weapon was connected to the drug trafficking offense. *Ovalle–Marquez*, 36 F.3d at 224. An example of a "special circumstance" is provided by the guideline commentary: "the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." U.S.S.G. § 2D1.1, comment. (n.3).

■ Here, the district court's *factual* findings are unassailable and Lagasse does not challenge them on appeal: during the indictment period, Lagasse was involved in the robbing of a coconspirator,[4] at knife point, of drugs and money. What the parties do dispute is the district court's application of the guidelines to these facts. While we give "due deference" to the court's exercise in this regard, 18 U.S.C. § 3742(e), if its application is contrary to the law, we must correct the error. *See United States v. Grandmaison*, 77 F.3d 555, 560 (1st Cir.1996).

The government concedes that the knife was used to rob fellow conspirators, but contends that the use of the weapon was intended to "protect" Lagasse's access to the very drugs involved in the conspiracy and to "enforce" his demand for more crack to sell. The government emphasizes that Lagasse used the knife on the very premises from which the conspiracy was carried out and "during the active course of the conspiracy" and concludes that thus, it was not "clearly improbable" that the knife was connected with that offense. Finally, the government relies on the expressed policy concern behind the weapon enhancement: the increased danger of violence when drug traffickers possess weapons. U.S.S.G. § 2D1.1, comment. (n.3).

Lagasse responds that the armed robbery of drugs and money from a coconspirator was clearly unrelated to the charge to which he pleaded guilty: conspiracy to possess with intent to distribute crack. He contends that the robbery was adverse to the conspiracy's interests, and thus the knife cannot fairly be "connected" with the offense within the meaning of the guideline. We agree.

■ The government's observation that the knife was "present" during drug trafficking activity, on the facts of this case, misses the mark. It is true that we have recognized that the "presence" of a weapon at the site of drug trafficking activity supports the enhancement. *See United States v. Almonte*, 952 F.2d 20, 25 (1st Cir.1991), *cert. denied*,

---

4. Although Guzman and Naftali were not specifically named in the indictment as coconspirators, they were so identified in the prosecution's version of the events, which Lagasse accepted when pleading guilty.

503 U.S. 1010, 112 S.Ct. 1776, 118 L.Ed.2d 434 (1992). In addition, however, we have invariably observed that the weapon's presence implied its purpose to "protect" some aspect of the drug operation—*e.g.*, the drugs or the participants—even if it was not actually used to perpetrate the crime. *See, e.g., Ovalle–Marquez*, 36 F.3d at 224; *Pineda*, 981 F.2d at 574; *Castillo*, 979 F.2d at 11; *United States v. Preakos*, 907 F.2d 7, 9 (1st Cir. 1990); *Ruiz*, 905 F.2d at 508. Thus, our caselaw establishes only that a weapon's presence during the criminal activity will trigger the enhancement when the circumstances permit an inference that the weapon served to protect or otherwise facilitate the offense conduct.

Here, in contrast, the weapon played a role that was entirely adverse to the "interests" of the crime. Lagasse's offense, to which the enhancement attached, was criminal conspiracy—an agreement with others to engage in unlawful conduct. As the district court observed, the robbery was "not in furtherance of the drug conspiracy" but, in effect, a theft from the conspiracy—an act quintessentially antithetical to the offense.[5] The facts found by the district court indisputably negate the inference that normally arises from the presence of a weapon during drug trafficking activity. Had Lagasse been convicted of a drug possession or distribution crime with respect to the drugs stolen from Guzman, the case might have been different; but that is not what happened here.[6]

Thus, we hold that the facts of this case do not come within the seemingly broad purview of the weapon enhancement. *See* U.S.S.G. § 2D1.1, comment. (n.3) (indicating that the enhancement applies if the weapon was somehow "connected" with the offense). Moreover, we are unpersuaded by the government's reliance on the guideline's underlying concern about the increased danger of violence when drug traffickers possess weapons. The guideline is not intended to cover every instance in which a drug trafficker possesses a weapon. Rather, the enhancement applies when the weapon possession has the requisite nexus to the relevant *offense*. Because the court erred in its interpretation and application of the weapon enhancement, that part of Lagasse's sentence must be vacated.

## C. Enhancement for Obstruction of Justice

Lagasse also claims that the court erred in finding that he obstructed justice and in adjusting his sentence accordingly. Sentencing Guideline § 3C1.1 provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."

At the sentencing hearing, an agent with the United States Immigration and Naturalization Service testified that, on December 22, 1994, he heard a general discussion among Lagasse and his codefendants (who, at the time, were awaiting arraignment in a lockup area) relating their belief that two individuals named Scott and Patty Poulin were "the rats" in the operation and that their cooperation with authorities was the cause of the arrests. A corrections officer at the Kennebec County jail testified that, on the morning of May 22, 1995—a time after which Lagasse had pleaded guilty but before his sentencing—Lagasse approached Scott Poulin in the jail recreation yard and punched him. The officer further testified that Poulin was groggy and bleeding from the mouth and nose, and was sent to the prison infirmary. An agent with the MDEA testified that, in July 1995, he asked Poulin about the assault, and Poulin told him that Lagasse "sucker punched" him and stated, "I know you're a rat, this is for being a rat.

---

**5.** There is no evidence in the record that Lagasse sold any of the drugs taken from Guzman (although there is a suggestion that he shared some of them with his brother, Michael Lagasse).

**6.** The government incorrectly cites, as applicable here, a previous version of § 2D1.1(b), which contained the following underscored language:

"If a dangerous weapon (including a firearm) was possessed *during commission of the offense,* increase by 2 levels." *See* Amendment 394, U.S.S.G.App. C. The Sentencing Commission deleted that language by amendment, effective November 1, 1991. *Id.*

You better ... stop talking." [7]

From this evidence, the district court found that Lagasse struck Poulin because of Poulin's cooperation "at a time when these matters were still pending" and thus, the obstruction of justice enhancement was warranted. On appeal, Lagasse contends that the obstruction enhancement was improper because, while he may have struck Poulin in retaliation for being a "rat," there could not have been an obstruction of justice because he had already pleaded guilty. To this end, he asserts that Poulin had nothing to contribute to the sentencing determination and, in fact, was in no way involved with that disposition. Lagasse is wrong for two reasons.

First, the district court supportably found that Lagasse knew of Poulin's cooperation and assaulted him to prevent further similar conduct. Although Lagasse had already pleaded guilty to the offense, he struck Poulin after the preparation of his PSR but before his sentencing. While Poulin was not specifically mentioned in the PSR, he had been separately indicted as a coconspirator of Raul and Jesus Baez, two of Lagasse's codefendants. Because Lagasse believed that Poulin was the "rat" in the operation, a reasonable inference from the evidence is that Lagasse thought that Poulin could provide information, such as drug quantity, that would affect his sentence. In light of this evidence, especially Lagasse's warning to "stop talking," we cannot say that the court clearly erred in finding that Lagasse's assault on Poulin was intended to prevent any further cooperation in the proceedings against Lagasse. The fact that Poulin did not, or even could not have, contributed anything to the sentencing process is irrelevant because the enhancement applies to attempted, as well as actual, witness intimidation. See U.S.S.G. § 3C1.1, comment. (n.3(a)); see United States v. Cotts, 14 F.3d 300, 307 (7th Cir.1994) (finding enhancement proper where the defendant plotted to kill a fictional informant).

Second, even if the evidence only supported a finding that the assault was in-

tended to retaliate for past cooperation (and not to prevent future acts), the obstruction of justice enhancement would be appropriate. Application note 3(i) to the obstruction guideline states that the enhancement applies for "conduct prohibited by 18 U.S.C. §§ 1501–1516." U.S.S.G. § 3C1.1, comment. (n.3(i)). In turn, 18 U.S.C. § 1513(b) prohibits the infliction of bodily injury with the intent to retaliate for the providing of information relating to a federal offense. Here, there was ample evidence that Lagasse injured Poulin in retaliation for his past cooperation. This conduct falls squarely within the obstruction of justice guideline. See Cotts, 14 F.3d at 308 (holding that the guideline's reference to § 1513 allows an obstruction enhancement even where the motive was only to "punish a snitch").

We find no error in the court's enhancement of Lagasse's sentence for obstruction of justice.

## D. Denial of Adjustment for Acceptance of Responsibility

Lagasse contends that he was entitled to a downward adjustment for acceptance of responsibility because he pleaded guilty within months of his arrest and appeared before a grand jury on the government's behalf. Although the court refused to grant the adjustment, it did expressly take into account Lagasse's guilty plea when fixing a sentence in the middle of the applicable guideline range, despite the government's recommendation for the maximum imprisonment term.

A two-level reduction in the offense level is warranted "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1. However, "[a] defendant who enters a guilty plea is not entitled to an adjustment [for acceptance of responsibility] as a matter of right." Id. comment. (n.3); see also United States v. Royer, 895 F.2d 28, 29–30 (1st Cir.1990) (explaining that "a downward adjustment for acceptance of responsibility is not automati-

---

7. In contrast, Lagasse testified that he never hit Poulin. He further stated that he did not know that Poulin was cooperating with the authorities, and pointed out that he (Lagasse) was the one who testified against Poulin before a grand jury. Lagasse does not press this position on appeal.

cally to be conferred upon every accused who pleads guilty"). While pleading guilty before trial and truthfully admitting the offense conduct will constitute "significant evidence" of acceptance of responsibility, "this evidence may be outweighed by conduct of the defendant that is inconsistent." U.S.S.G. § 3E1.1, comment. (n.3).

Only in "extraordinary cases" will the adjustment be appropriate where, as here, the defendant has received an obstruction of justice enhancement pursuant to § 3E1.1. *Id.* comment. (n.4). Other than referring to his challenge to the obstruction of justice enhancement, Lagasse does not indicate how his case might be "extraordinary" enough to allow the acceptance of responsibility adjustment. Because Lagasse's case is "ordinary" in that the obstructive conduct "indicates that the defendant has not accepted responsibility for his criminal conduct," *id.*, the denial of the adjustment was proper. *See United States v. Wheelwright,* 918 F.2d 226, 229 (1st Cir.1990).

■ The district court alternatively found that Lagasse did not deserve the acceptance of responsibility adjustment because he was involved in an attempt to smuggle drugs into prison. At the sentencing hearing, an MDEA agent testified that on March 25, 1995, he went to the Maine Correctional Center to investigate an anonymous tip that Lagasse's girlfriend, Grace Sheloske, would attempt to smuggle drugs into the prison that day. When Sheloske arrived at the prison, she told the agent that she was there to visit Lagasse and eventually admitted that she was concealing a small amount of crack. Sheloske refused to identify to whom she intended to give the drugs, stating that she did not want to "get him in trouble." A deputy United States Marshal testified that, just before the sentencing hearing, he interviewed Jeffrey Rumore—an inmate who worked for the prison laundry—who told him that Lagasse had confided to Rumore that Sheloske planned to smuggle crack into the

prison and pass it during contact visits in the visiting room.

Based on this testimony, the court found that it was Rumore who tipped off the authorities of the smuggling plan, that Lagasse must have told Rumore about the plan, and thus Lagasse knew in advance that Sheloske was carrying drugs for him and indeed, that she did so at his behest. On appeal, Lagasse argues that the court should not hold against him "the one single occasion where an admitted drug addict tried to feed his habit," combined with the Poulin assault, to deny him any credit for acceptance of responsibility. We must disagree.

■ "[I]t is primarily up to the district court to decide whether or not the appellant accepted responsibility for his conduct 'with candor and authentic remorse.'" *Wheelwright,* 918 F.2d at 229 (quoting *Royer,* 895 F.2d at 30). We have held that, while a court may not require a defendant to accept responsibility for conduct beyond the offense of conviction, it may consider a defendant's post-offense conduct—including illegal drug activity—as evidence of the sincerity of his claimed remorse for the convicted offense. *United States v. O'Neil,* 936 F.2d 599, 599–601 (1st Cir.1991) (upholding sentencing court's consideration of post-offense use of marijuana in determining applicability of adjustment for mail theft offense); *accord United States v. Byrd,* 76 F.3d 194, 196–97 (8th Cir.1996) (listing cases). While such conduct does not compel the denial of credit for acceptance of responsibility, *O'Neil,* 936 F.2d at 600, the court could reasonably conclude here that Lagasse's involvement in the attempted smuggling of drugs into the prison was inconsistent with his claimed remorse, thus negating the applicability of the adjustment. *See United States v. Olvera,* 954 F.2d 788, 793 (2d Cir.) (sentencing court permissibly found that the smuggling of marijuana into prison "was inconsistent with acceptance of responsibility"), *cert. denied,* 505 U.S. 1211, 112 S.Ct. 3011, 120 L.Ed.2d 885 (1992).[8]

---

8. We note that the guideline commentary lists the following considerations in favor of the acceptance of responsibility adjustment that, here, weigh against Lagasse: voluntary termination or withdrawal from criminal conduct or associations, and post-offense rehabilitative efforts including drug treatment. U.S.S.G. § 3E1.1, comment. (n.1(b) & (g)).

In sum, we find no error in the court's refusal to grant Lagasse the benefit of an adjustment for acceptance of responsibility.

### III.

### *Conclusion*

We *affirm* the district court's sentence enhancement for obstruction of justice and its denial of credit for acceptance of responsibility. Because of the legal error in the application of the weapon enhancement, we *vacate* the sentence and *remand* for resentencing consistent with this opinion.